UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEVEN KARAS and GAIL KARAS | : | NO.: 3:13-CV-01836-SRU |
| v. | : | |
| LIBERTY INSURANCE CORPORATION | : | DECEMBER 20, 2017 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CERTIFICATION OF QUESTIONS TO THE CONNECTICUT SUPREME COURT**

The defendant, Liberty Insurance Corporation ("Liberty"), hereby submits this memorandum of law in support of its motion for certification of questions to the Connecticut Supreme Court.

**I. PROPOSED QUESTIONS TO BE CERTIFIED TO THE CONNECTICUT SUPREME COURT.**

During the November 10, 2016 hearing on Liberty Mutual Fire Insurance Company's motion for summary judgment in *Roberts v. Liberty Mutual Fire Ins. Co.*, Civil Docket No. 3:13-CV-00435 (SRU), the Honorable Stefan R. Underhill indicated that he was "strongly considering certifying this case, and certain issues in this case," to the Connecticut Supreme Court, and asked the parties to identify the specific questions that should be certified so as to "provide as much guidance as possible." **Ex. A**, pp. 20-22.

Over a year later, there is still no appellate guidance, no case has even been appealed which directly concerns the issues that Liberty requests be certified, and both

the state and federal trial courts are clogged with cases turning on identical issues. Moreover, new lawsuits continue to be filed almost daily.

Following the December 14, 2017 hearing on its motion for summary judgment in this matter, Liberty noted its intent to seek certification. Thus, Liberty respectfully submits that the following questions should be certified to the Connecticut Supreme Court:

> 1. Is "substantial impairment of structural integrity" the applicable standard for "collapse" under the provision at issue?
>
> 2. If the answer to question one is yes, then what constitutes "substantial impairment of structural integrity" for purposes of applying the "collapse" provision of this homeowners insurance policy?
>
> 3. Under Connecticut law, do the terms "foundation" and/or "retaining wall" in a homeowners insurance policy unambiguously include basement walls? If not, and if those terms are ambiguous, should extrinsic evidence as to the meaning of "foundation" and/or "retaining wall" be considered?

**II.  UNDER THE APPLICABLE LEGAL STANDARDS, CERTIFICATION IS WARRANTED.**

Connecticut law expressly authorizes a federal district court to certify questions of state law to the Connecticut Supreme Court "if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state." Conn. Gen. Stat. § 51-199b(d); *see also* Connecticut Practice Book, §82-1 (same). Accordingly, this Court has the

power to certify questions to the Connecticut Supreme Court, as long as the referenced statutory standards are met.

Those standards are easily satisfied here, because: (a) the answer to each of the above questions could be -- and likely will be -- determinative of insurance coverage issues in not only the present case but also dozens of other cases pending in Connecticut federal and state courts which turn on the same insurance coverage issues; and (b) there is no controlling Connecticut appellate decision, constitutional provision or statute governing any of the issues for which Liberty seeks certification.

In fact, the questions identified above are textbook examples of issues that should be resolved by certification, for at least three reasons. First, they involve important issues of Connecticut state law, as exemplified by the nearly daily news stories addressing the defective concrete problem in Connecticut. See *Parrot v. Guardian Life Ins. Co. of America,* 338 F.3d 140, 144 (2d Cir. 2003) ("state courts should be accorded the first opportunity to decide significant issues of state law through the certification process"); *Fireman's Fund Ins. Co. v. TD Banknorth Ins. Agency, Inc.,* 644 F.3d 166, 172 (2d Cir. 2011) (in certifying an insurance issue, the court noted that "[i]nsurance is an important industry in Connecticut, and Connecticut's Supreme Court is one of the leading authorities in this area").

Second, these issues are recurring, and will continue to appear frequently, absent definitive guidance from the Connecticut Supreme Court. *See* Wright, Miller, Cooper &

Amar, Federal Practice and Procedure: Jurisdiction 3d §4248 ("Questions that recur frequently are more likely candidates for certification than those that are uncommon."). There are dozens of lawsuits pending in Connecticut state and federal courts that involve the insurance issues stated above in connection with claims of defective concrete supplied by J.J. Mottes Concrete Company. More cases continue to be filed. Obtaining definitive answers to these proposed questions will, at the least, streamline those cases.

Third, certification will ensure that these important issues are decided under the correct principles of Connecticut state law. At present, the federal courts are addressing these novel issues without any guidance from the Connecticut Supreme Court. This presents the risk that federal courts may predict Connecticut law incorrectly. *See* Delores K. Slotvier, *A Federal Judge Views Diversity Through The Lens of Federalism*, 78 Va. L. Rev. 1671, 1677-78 (1992) (noting that "such incorrect predictions inevitably skew the decisions of persons and businesses who rely on them" and "may even mislead lower state courts that may be inclined to accept federal predictions as applicable precedent"). There is no reason for federal courts to speculate about the proper interpretation of novel issues of state law, when those issues can be certified to the Connecticut Supreme Court for resolution. "Through certification of novel or unsettled questions of state law for authoritative answers by a State's highest court, a federal court may save 'time, energy, and resources and hel[p] build a cooperative

judicial federalism.'" *Arizonans for Official English v. Arizona*, 520 U.S. 43, 77, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (citations omitted).

In fact, this Court in *Roberts* identified precisely why certification is the best and most efficient path forward with respect to these issues. In denying Liberty's motion for summary judgment on certain of the substantive issues for which it seeks certification here, but granting its motion with respect to the plaintiffs' CUTPA/CUIPA count, the Court noted:

> "Unless and until a higher court rejects Liberty Mutual's position, the insurer is entitled to continue making its (hitherto unsuccessful) arguments with respect to coverage, without exposing itself to liability under CUTPA/CUIPA. . . .Here, I conclude that the existence of nonbinding decisions that deemed Liberty Mutual potentially liable would not make it "reasonably clear" that Liberty Mutual violated CUTPA/CUIPA."

*Roberts v. Liberty Mut. Fire Ins. Co.*, 2017 WL 3710062, *14-15 (D. Conn. 2017)(citations omitted).

In rejecting the plaintiffs' claim for breach of the implied covenant of good faith and fair dealing, the Court similarly noted that "until such time as those arguments are rejected by Connecticut's appellate courts or the Second Circuit, Liberty Mutual is entitled to continue making them." *Roberts.* at *13.

Accordingly, this Court is faced with two options. It can either: (a) certify the questions below to the Connecticut Supreme Court, so that the Connecticut Supreme Court can provide answers and appropriate guidance to the state and federal trial courts

where the cases are pending; or (b) force the parties to repeatedly litigate these same issues in the state and federal trial courts without such guidance, only to potentially have to re-litigate them after one of these cases finally reaches the appellate courts in the normal course. The former option is far more efficient for the parties and the courts.

### III. EACH OF THE QUESTIONS SHOULD BE CERTIFIED.

#### *1.* **Is "substantial impairment of structural integrity" the applicable standard for "collapse" under the provision at issue?**

Liberty believes that *Beach v. Middlesex Mut. Assur. Co.*, 205 Conn. 246 (1987) is <u>not</u> binding authority with respect to the policy language at issue here. The policy at issue in *Beach* had a markedly different collapse provision. *Id.* at fn. 1. *Beach* noted that "[i]f the defendant wished to rely on a single facial meaning of the term 'collapse'…it had the opportunity expressly to define the term to provide for the limited usage it now claims to have intended." *Id.* at 251. *Beach* cited as an example *Nida v. State Farm Fire & Cas. Co.*, 454 So. 2d 328, 334 (La.App. 1984), wherein the policy at issue—like Liberty's here—defined collapse in the negative; namely, that it does not include settling, cracking, shrinking bulging or expansion. *Id.*

*Nida* noted that "property insurance policies extending coverage to direct loss caused by 'collapse' of the insured building but excluding loss from settling, cracking, bulging, and the like, have generally been held not to encompass damage to…foundations which have in fact settled, cracked, or bulged." *Id.* at 334. *Nida* cited

with approval *Krug v. Millers Mut. Ins. Ass'n*, 495 P.2d 949 (Kan. 1972), wherein the Kansas Supreme Court rejected a "collapse" claim and contentions that "cracking" referred to only supposedly "normal" cracking. Thus, *Beach*'s approving reference to *Nida* supports the conclusion that this claim does not constitute a "collapse" under Connecticut law.

The recent, well-reasoned decision in *Tustin Field Gas & Food, Inc. v. Mid-Century Ins. Co.*, 13 Cal.App. 5th 220, 228 (CA 2d DCA 2017) reinforces that conclusion. In *Tustin Field*, a California appellate court held that under the Policy language at issue here, a "substantial impairment of structural integrity" is <u>not</u> a "collapse" because "collapse" excludes settling, cracking, shrinkage, bulging or expansion:

> "When a policy excludes from coverage 'settling,' 'cracking,', 'shrinkage,' or 'expansion,' the policy will not cover a collapse—whether actual or imminent—based solely on a 'substantial impairment of structural integrity'; **to do otherwise would negate the exclusionary clause for settling and the like.**
>
> "These undisputed facts show that the damage to UST-1 constitutes at most a 'substantial impairment of [its] structural integrity.' However, because the Policy excludes 'settling' and the like, a 'substantial impairment of structural integrity' is not a 'collapse' as a matter of law."

*Id.* (emphasis supplied).

*Beach* implored insurers to utilize the Policy language at issue in *Nida* if it wished to exclude a loss predicated on settling, cracking, shrinkage or expansion. That is precisely what Liberty did here. Given the approving reference in *Beach* to *Nida,* it

7

appears that "substantial impairment of structural integrity" is not the standard for "collapse" when that provision excludes settling, cracking, shrinkage, or expansion. If there is any doubt about that conclusion, the Connecticut Supreme Court should be asked to weigh in on the meaning and scope of its decision in *Beach*.

### 2. If the answer to question one is yes, then what constitutes "substantial impairment of structural integrity" for purposes of applying this "collapse" provision?

If the answer to question one is yes, then Liberty seeks conclusive resolution of what constitutes a "substantial impairment of structural integrity" for purposes of applying the "collapse" provision of this policy. *Dkt. No.* 59-1, pp. 10, 28.

Although the Connecticut Supreme Court held in *Beach* that a markedly different "collapse" provision in a policy is ambiguous and includes "substantial impairment of structural integrity," the court did not articulate what constitutes such substantial impairment of structural integrity.

In the 30 years since *Beach* was decided, no Connecticut appellate court has provided guidance as to what "substantial impairment of structural integrity" means. Therefore, as Judge Underhill observed, it would be virtually impossible for the Court to meaningfully instruct a jury as to what that phrase means or how to apply it. **Ex. A**, pp.

8-9.[12] As a result, the jury would be faced with competing expert opinions without the tools needed to understand, evaluate and properly credit those opinions. Certification will allow the Connecticut Supreme Court to supply a definition of "substantial impairment of structural integrity" that insureds, insurers, judges (at the summary judgment stage) and juries (if necessary) can understand and apply, so that defective concrete cases are not decided by conclusory legal buzzwords and a battle of experts.[3]

The U.S. Court of Appeals for the Ninth Circuit Court was recently faced with this exact circumstance, and decided to ask the Washington Supreme Court for guidance. The Washington Supreme Court held that this "collapse" provision was ambiguous and included substantial impairment of structural integrity. *Queen Ann Park Homeowners Ass'n. v. State Farm Fire and Casualty Co.*, 183 Wash.2d 485, 489, 352 P.3d 790

---

[1] In their submission in *Roberts* regarding certification, plaintiffs attached the jury instructions in *Bacewicz v. NGM Ins. Co.,* No. 3:08-cv-1530 (JCH). *See Roberts Dkt. No. 92-1*, pp.17-18. The jury in that case was instructed that a "building may also 'collapse' under Connecticut law if it suffers a 'substantial impairment of its structural integrity.'" *Id*. The jury had no further instruction as to what that phrase means or how to apply it, which supports Judge Underhill's observation.

[2] The Notice of Supplemental Authority filed in *Roberts*, *Dkt. No. 96* details the inevitable and foreseeable difficulties of trying a crumbling foundation case to a jury absent any definition of "substantial impairment of structural integrity."

[3] The plaintiffs' engineer, David Grandpre, admits that "substantial impairment of structural integrity" is not an engineering term of art. *Dkt. No. 59-5*, p. 31. In fact, Mr. Grandpre was first introduced to the phrase in his 24th year of being a licensed professional engineering by plaintiffs' counsel in connection with his role as litigation consultant in *Bacewicz*. *Dkt. No. 59-5*, pp. 42-43. Thus, his opinion as to what constitutes a "substantial impairment of structural integrity" is tantamount to allowing plaintiffs' counsel to testify by proxy under the undue cloak of expert testimony.

(Wash. 2015). The court went on to define precisely what "substantial impairment of structural integrity" means:

> Taken together, "substantial impairment" of "structural integrity" means an impairment so severe as to materially impair a building's ability to remain upright. Considering the Policy as a whole, we conclude that "substantial impairment of structural integrity" means the substantial impairment of the structural integrity of all or part of a building that renders all or part of the building unfit for its function or unsafe and, in this case, means more than mere settling, cracking, shrinkage, bulging, or expansion.

*Id.*, 183 Wash.2d at 492.

Certification of that question in *Queen Ann* resulted in a definition that was straightforward and easy for insureds, insurers, judges and juries to apply. *See*, *Queen Ann Park Homeowners Ass'n v. State Farm Fire & Cas. Co.*, 633 Fed.Appx. 415, 417 (9th Cir. 2016)("simply implausible" that walls had "collapsed" when a 1998 policy was in effect given that walls were still standing in 2015); *Am. Econ. Ins. Co. v. CHL, LLC,* 2016 WL 3632488 (W.D. Wash. 2016)(implausible that there was a severe impairment of the ability of the walls to remain upright between 1999 and 2002 when the building remained standing in 2014). Certification here would provide the same clarity to "collapse" claims in Connecticut.

The definition of "substantial impairment of structural integrity" adopted by the Washington Supreme Court is both logical and consistent with the Connecticut Supreme Court's formulation in *Beach*. Other cases from across the country have applied similar formulations. *See Roberts*, *Dkt. No. 86* at 5-11 (collecting cases). However, rather than

this Court speculating as to how the Connecticut Supreme Court might define "substantial impairment of structural integrity," only to have that decision appealed to the U.S. Court of Appeals for the Second Circuit (which may very well certify the question in any event), the more prudent and efficient course of action is to certify that question to the Connecticut Supreme Court now.[4] Obtaining a definition of what constitutes a "substantial impairment of structural integrity" would substantially resolve which insurance policy (if any) may provide coverage for a claim[5], thereby providing certainty for insureds, insurers, and the trial courts and allowing cases to be substantially narrowed.

---

[4] This Court did not certify this question in *Belz*, 204 F.Supp 3d 457, 464 (D. Conn. 2016) or in *Bacewicz v. NGM Ins. Co.*, 2010 WL 3023882 (D. Conn. 2010). However, when *Bacewicz* was tried in 2011 there were not dozens of similar pending claims. Moreover, the basement walls had been replaced in both *Belz* and *Bacewicz*. **Ex. A**, pp.18-19. This distinguishes those cases from *Roberts*, the instant matter, and almost all other matters with substantially identical allegations. With the walls already replaced, a jury charge regarding the definition of "substantial impairment of structural integrity" was arguably of diminished importance in *Bacewicz* and *Belz.*

[5] In their submission in *Roberts*, plaintiffs sought certification concerning whether multiple insurance policies could be triggered by alleged damage to a single home. Certification of the trigger issue is unnecessary here, for at least two reasons. First, no Connecticut case has applied, or even suggested the possibility of, a continuous trigger in the context of a first-party insurance claim. Second, the answer to the second proposed certified question should provide sufficient clarity as to which policy is triggered in a collapse claim, as exemplified by the fact that the Washington Supreme Court did not need to reach the trigger issue in *Queen Ann* because of how it defined "substantial impairment of structural integrity." This Court correctly ignored the trigger issue when it was raised by the plaintiffs in *Belz*.

### *3.* **Under Connecticut law, do the terms "foundation" and/or "retaining wall" in a homeowners insurance policy unambiguously include basement walls? If not, and if those terms are ambiguous, should extrinsic evidence as to the meaning of "foundation" and/or "retaining wall" be considered?**

The Liberty policy at issue in this case expressly excludes from coverage loss to a "foundation" or "retaining wall," unless the loss to the foundation or retaining wall is a direct result of the collapse of a building. *See Dkt. No. 59-1*, pp. 10, 28. This Court in *Bacewicz v. NGM Ins. Co.*, 2010 WL 3023882 (D.Conn 2010); *Karas v. Liberty Ins. Corp.*, 33 F.Supp. 3d 110 (D.Conn. 2014); *Belz v. Peerless Ins. Co*, 204 F.Supp. 3d 457 (D.Conn. 2016) and *Roberts v. Liberty Mut. Fire Ins. Co.*, 2017 WL 3710062 (D. Conn. 2017), held that the terms "foundation" and "retaining wall" are ambiguous. This Court then applied the doctrine of *contra preferentum* and held that the interpretation which favors coverage for the insured must be adopted, i.e. that a basement wall is not a foundation or retaining wall.

No Connecticut appellate court has ever determined that the terms "foundation" or "retaining wall" are ambiguous as utilized in a homeowners insurance policy, or that they do not apply to basement walls. To the contrary, the Connecticut Supreme Court in *Beach* used the terms "foundation," "retaining wall" and "basement walls" interchangeably, which strongly suggests that the federal courts in *Bacewicz* and its progeny are not accurately predicting Connecticut state law. *Beach* at 247-48 (repeatedly referring to basement walls as "foundation walls", "retaining walls," and the

"foundation"). Contrary to the holdings in *Bacewicz et al.*, the existence of more than one dictionary definition "is not the sine qua non of ambiguity under Connecticut law. If it were, few words would be unambiguous." *Buell Industries, Inc. v. Greater New York Mutual Ins. Co.*, 259 Conn. 527, 546, 791 A.2d 489 (2002).

As noted in Liberty's memorandum in support of its motion for summary judgment and reply brief in this matter, and the exhibits thereto, the terms "foundation" and/or "retaining wall" are used in building codes, media reports, home inspection reports, the engineering industry, the residential construction industry, the Attorney General's report, the Department of Consumer Protection notice, the recently-enacted statute titled "An Act Concerning Concrete Foundations", and the recent Department of Insurance notice regarding the inability of insurers to cancel or non-renew policies. Those sources provide a much better definition of "foundation" and "retaining wall" than a select contrary dictionary definition relied upon by plaintiffs' counsel. Considering the profound impact of the proper interpretation of the terms "foundation" and "retaining wall" on dozens of pending cases and hundreds of policyholders, the Connecticut Supreme Court should be asked to definitively resolve this issue.

If the Supreme Court were to determine that "foundation" and/or "retaining wall" are ambiguous, it would make sense to ask the related question of whether extrinsic evidence is admissible to show the intent of the parties to the contract, rather than relying

strictly on *contra proferentum* to interpret the policies. As Chief Justice Rogers has noted:

> [I]n the event that an insurance policy term is deemed to be ambiguous, the parties are entitled to present extrinsic evidence regarding the mutual intent of the insured and the insurer as to the scope of coverage, and the trial court must consider that evidence before applying the rule of contra proferentem to resolve the ambiguity in favor of the insured. In other words, the rule should be applied as a tie breaker only when all other avenues to determining the parties' intent have been exhausted. See *Cruz v. Visual Perceptions, LLC,* 311 Conn. 93, 107–108, 84 A.3d 828 (2014); see, e.g., *Lexington Ins. Co. v. Lexington Healthcare Group, Inc.,* 311 Conn. 29, 59 n. 20, 84 A.3d 1167 (2014); *Connecticut Ins. Guaranty Assn. v. Fontaine,* 278 Conn. 779, 788–89, 900 A.2d 18 (2006); *Metropolitan Life Ins. Co. v. Aetna Casualty & Surety Co.,* 255 Conn. 295, 306, 765 A.2d 891 (2001); *see also* 1 B. Ostrager & T. Newman, Handbook on Insurance Coverage Disputes (16th Ed. 2013) § 1.01[b] and [c], pp. 14–18; 1 B. Ostrager & T. Newman, supra, § 1.05, at pp. 55–56; 2 S. Plitt et al., Couch on Insurance Law (3d Ed. Rev. 2010) § 22:16, pp. 22–93 through 22–94; but see 1 New Appleman on Insurance Law, Library Edition, (J. Thomas & F. Mootz eds., 2011) § 5:02, pp. 5–7.

*Connecticut Ins. Guar. Ass'n. v. Drown*, 314 Conn. 161, 195-96, 101 A.3d 200 (2014) (concurring opinion).

"It would make absolutely no sense to require the trial court to construe the agreement against the defendant if the extrinsic evidence showed that it was more likely than not that the parties had a contrary intent." *Cruz*, 311 Conn. at 108.

## IV. CONCLUSION.

For the reasons set forth herein, Liberty Insurance Corporation respectfully requests that the Court certify the questions identified above to the Connecticut

14

Supreme Court for adjudication. In addition to obtaining clarification with respect to important, recurring, and unresolved issues of Connecticut state law, certification will provide an added benefit: it will eliminate an unfortunate tactic that plaintiffs' counsel are utilizing in these cases to pressure insurers into paying claims for which coverage is, at best, unclear.

Specifically, plaintiffs routinely add claims for common law bad faith and violations of CUTPA/CUIPA to their breach of contract claims, even though, as this Judge Underhill recognized, "reasonable people can disagree" as to the coverage issues involved. **Ex. A**, p. 4. At the same time, plaintiffs resist certification at every turn, thereby preventing insurers from obtaining clarity with respect to those coverage issues. Connecticut trial courts are aware of this frequent and unfortunate practice of attempting to prop up questionable (at best) coverage arguments with baseless extra-contractual claims:

> "…[F]irst-party actions against insurers…are increasingly accompanied by bad faith claims and CUTPA/CUIPA actions. Not infrequently, these additional claims are themselves brought in bad faith, to 'up the ante' at pretrial and trial by increasing the insurer's exposure..."

*Khanthavong v. Allstate Ins. Co.,* 1996 WL 704366, *6 (Conn. Super 1996).

Nevertheless, plaintiffs sometimes successfully argue that insurers are acting in bad faith by not accepting as settled law select federal trial court decisions that have not been tested in any Connecticut appellate decision and which other federal trial court judges have

15

subsequently declined to follow. *Belz*, 204 F.Supp. 3d at 467-469; *Roberts*, 2017 WL 3710062, *13-15.

As a result, insurers like Liberty are often left with two equally unacceptable options: (a) settle the claim even though their contractual interpretation is reasonable, enjoys significant appellate support from out-of-state decisions, and no Connecticut appellate court has provided a definitive ruling; or (b) risk an extra-contractual judgment by a jury and irreparable reputational business harm. Obtaining answers to the certified questions set forth above will give both insurers and insureds guidance with respect to how their policies apply to defective concrete claims, thereby eliminating this unnecessary conundrum and preventing unnecessary extra-contractual claims.

DEFENDANT,
LIBERTY INSURANCE CORPORATION


By __/s/ Kieran W. Leary _____
   Kieran W. Leary (ct29484)
   Howd & Ludorf, LLC
   65 Wethersfield Avenue
   Hartford, CT  06114
   (860) 249-1361
   (860) 249-7665 (Fax)
   E-Mail: kleary@hl-law.com

**CERTIFICATION**

       This is to certify that on **December 20, 2017**, a copy of the foregoing **Memorandum of Law in Support of Motion for Certification of Questions to Connecticut Supreme Court** was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Michael D. Parker, Esq.
Jeffrey R. Lindequist, Esq.
Law Office of Michael D. Parker
One Monarch Place, Suite 2200
Springfield, MA 01144
mparker@mdparkerlaw.com
jlindequist@mdparkerlaw.com

                                                  /s/ Kieran W. Leary
                                                  Kieran W. Leary